JOURNAL ENTRY and OPINION
Defendant-appellant Timothy Hightower appeals from his convictions after a jury trial of rape and disseminating matter harmful to a juvenile.
Appellant asserts the trial court improperly both limited his cross-examination of the victim and excluded certain evidence, thus compromising his effort to present his defense. Appellant further asserts his convictions are not based upon the weight of the evidence adduced at trial. Appellant finally asserts the trial court erred in sentencing him to the maximum term for the offense of rape.
This court has reviewed the record and finds none of appellant's assertions to have merit. His convictions and sentences, therefore, are affirmed.
Appellant's convictions result from his association with the victim, a ten-year-old girl. Appellant operated schools where he provided martial arts instruction. One school was located at 12605 Buckeye Road in Cleveland, Ohio. In order to increase his business at that location, he prepared and mailed to households in the vicinity of the school an advertising "flyer,"[1] seeking new students.
The victim's mother and step-father, Carmen and Terry Davenport, received the advertisement. Terry Davenport recognized appellant's name as the two had attended high school together. Believing such instruction would increase their child's self-esteem, and relying upon Terry's acquaintance with appellant, they enrolled their daughter at appellant's school.
The victim initially enjoyed the martial arts class. The Davenports were gratified to notice on the nights Terry arrived home from his work to drive her to class, the victim was dressed and eagerly awaiting him. The victim earned higher ranks by passing the necessary examinations and also attended "championship" matches. Eventually, after approximately six months of instruction, the victim enrolled in the school's "Black Belt Club." This was an elite group of students who had attained a certain rank; the enrollment fee for the club was $499.00.
In order to attend the classes, the victim was required to wear certain clothing and protective "gear." Appellant thus measured the victim for a "chest protector" and a "groin cup when she first began her lessons. These first measurements of her "head, chest and waist" were taken with Terry Davenport observing; the victim remained fully clothed for the process.
Sometime later, however, appellant informed Terry that he "had to measure [the victim] again." This time, appellant escorted the victim into a "little dressing room and slid the door closed. The new privacy requirement puzzled Terry. Inside the room, appellant asked the victim to remove her shirt and her bra in order for him to measure her for a chest protector.
In April 1998, some allegations of sexual abuse involving appellant surfaced. Based upon information provided by two of his young students, appellant was arrested and eventually charged with six counts of gross sexual imposition, R.C. 2907.05.[2] Appellant was released on bond. Although attendance at the Buckeye Road school was affected by the charges, appellant nevertheless carried on with his teaching during the pendency of the criminal proceedings.
The victim continued her lessons at the martial arts classes throughout the spring and summer of 1998. Moreover, she occasionally saw appellant outside of classes since his home was next door to her aunt's residence. Appellant lived there with several of his children, some of whom were close to the victim in age.
This proximity to appellant's home encouraged some socialization between the families; therefore, when appellant asked the Davenports' permission to have the victim "baby-sit" in exchange for a discount to the Davenports on some "gear" the victim would need for an upcoming tournament, they agreed.
The victim, at that time, merely helped with appellant's seven- and four-year-old daughters as appellant and his girlfriend, Shannon Hollis, remained in the home. The victim watched a "tape" and spent the night "on the floor" with appellant's children.
The following weekend, appellant again requested the victim to "baby-sit" for him. On this occasion, Hollis was not at home. The victim played outside with appellant's children until he called her to come into his home.
Once indoors, appellant escorted the victim to his room, stating he had to "measure her. He ordered her first to "take off [her] shirt" so he could measure her chest with his cloth tape measure; the victim complied.
When she had done so, appellant "put up her bra" over her head, thus removing it completely, and measured "around [her] chest." He "[wrote] it down," then "pulled down [her] pants and [her] underwear." Appellant told her she would be required to wear a "growing cup" for the tournament, explaining that it would be a "protector" that would fit "inside of you." As he stood in front of the victim, he placed his "middle finger" into her vagina and moved it upward. The victim felt it penetrating her and felt its movement at least three times. Appellant then removed his finger and used the tape measure to measure it.
At that point, appellant sat down, pulling the victim onto his lap. The victim was "scared" and in pain; nevertheless, she told appellant she was "about to get up." Appellant did not restrain her, so the victim dressed. However, he told her she "[couldn't] tell nobody" about the episode. The victim left the house in tears and sought the familiarity of her aunt's home.
After that episode, the victim's attendance at her martial arts class began to change. She sometimes made herself unavailable when Terry was ready to take her, so her attendance became sporadic. After school was once again in session, at the beginning of September, the victim wanted her friends to attend with her.
On a Friday night shortly after the second babysitting incident, aware she had a martial arts session the following day, the victim asked her mother if a friend, Versie Gant, could "sleep over." Carmen Davenport agreed; therefore, on Saturday, Carmen drove both the victim and Versie to the lesson at appellant's school.
After the lesson, appellant told the victim that he needed to obtain some "gear" for her from another of his schools and that he wanted her to accompany him. Versie asked if she could "go with you all." Appellant responded negatively; she thus remained at the school as appellant drove away with the victim in his vehicle.
Appellant did not drive to his other school; instead, he took the victim to his home. When she was inside, he "put the VCR next to his TV," attached the two and played a videotape for the victim.
The victim recognized the people she observed on the videotape as appellant and a slightly older girl who previously had lived on the same street as the victim's family. The victim saw appellant "putting his penis in [the older girl's] vagina, and she was sucking his private." The victim told appellant she "didn't want to be [there]" and she "didn't want to see [that]." Appellant seemed irritated with this response; he shut off the machines and returned her to the martial arts school.
By this time, the victim's mother had arrived to retrieve the girls. She was surprised to see Versie waiting outside alone. Versie told her the circumstances of the victim's absence upon entering Carmen's vehicle. A few minutes later, when appellant "pulled up" with the victim in his vehicle, Carmen had a feeling something about the situation wasn't "right"; however, when she questioned the victim about her absence, the victim told her appellant had taken her to another school to "pick up her karate gear."
Thereafter, the victim "stopped going" to her martial arts class. She informed the Davenports she "didn't like it anymore." Moreover, the victim began having nightmares. Additionally, the victim now seemed to resent her step-father. On one occasion, Terry tapped the victim on her back as she sat doing her homework. In response, the victim leapt from her chair in a "rage" and, with the pencil she held, stabbed Terry in his arm. The Davenports were appalled at this change in their daughter's behavior but could not account for it.
On January 15, 1999 the victim received a telephone call from appellant. Appellant informed her a championship match was scheduled for later in the month; he wanted to know if she was going to attend. Upon hearing appellant's voice, the victim placed the telephone on the "three-way" capability for her parents to take part in the conversation. The adults discussed the fees involved and made arrangements for the victim to practice at the school on the following Monday evening, January 19, 1999.
The mother of one of the victim's classmates drove the victim to appellant's school on the appointed evening. After the practice, which lasted until approximately 10:00 p.m., appellant volunteered to drive three of his students home. The victim was one of those three.
Appellant accomplished this task with the other two students first; thus, only the victim remained in his vehicle. As appellant neared the victim's house, he reminded her of the upcoming match, then asked if he "could measure [her] up again." The victim declined. When appellant pressed her, she told him her mother could do it. Since appellant had, by this time, stopped his vehicle at her house, the victim hurriedly exited and proceeded indoors.
The victim's parents were relieved at her arrival since the lateness of the hour of her return seemed unusual; however, the victim's aspect of anger and sadness upon her return also seemed unusual. Carmen, who was taking a bath at the time, requested the victim to approach her and tell her about the practice.
Although the victim indicated the practice had gone well, her demeanor alerted Carmen that she was bothered about something. Carmen thus gave voice to a suspicion that had been building in her mind; she asked the victim if appellant ever had "[said] anything or touch[ed her] in the wrong way or anything like that?"
The victim initially responded, "No," but returned to her mother within moments, "slid down like a little puppy and put her head down." At that time, the victim told Carmen appellant "showed her a movie of him having sex with a little girl."
Carmen immediately determined to take the victim to the police station. As they were preparing to leave, however, she and Terry took the victim, who by then was "hysterical," aside. Carmen reassured her she need not return to martial arts class but also impressed upon her the need to report if "anything else happened." It was at this point that the victim described the digital rape upon her that appellant had committed.
The Davenports then proceeded to the police station. They made a report of the crimes, were told a detective would contact them the following morning, and were advised to take the victim for a medical evaluation.
The victim's evaluation by a pediatric nurse-practitioner who specialized in the area of suspected child sexual abuse took place on January 21, 1999. The nurse-practitioner found two transections of the victim's hymenal tissue, one complete and one partial, and also a separation of the posterior fourchette tissue. These abnormalities are "consistently seen in children who have been sexually molested." Since the tissues were healed, the nurse-practitioner opined the tissue trauma was not of recent origin.
During the ensuing police investigation, appellant's home was searched pursuant to a warrant. The police discovered a box containing numerous photographs of a naked young woman. When the detective assigned to the victim's case showed Carmen the photographs, Carmen identified the girl. With further investigation, the police discovered the girl had been fourteen years old at the time the photographs were taken.
Appellant subsequently was indicted in this case[3] on twenty-three counts as follows: one count of forcible rape upon the victim, a child under the age of thirteen, R.C. 2907.02, with a sexually violent predator specification; one count of disseminating matter harmful to juveniles, viz., the victim, R.C. 2907.31; eighteen counts of illegal use of a minor in nudity-oriented material, R.C.2907.323[4]; and three counts of gross sexual imposition, R.C.2907.05. The state dismissed the last three counts prior to appellant's trial, however, since they were duplicative of the charges filed in the earlier case against appellant.
Appellant's two cases were tried together to a jury. After hearing the testimony of numerous witnesses on behalf of both the state and appellant, the jury returned a verdict finding appellant guilty of rape, additionally finding both that the victim was under the age of thirteen and that the crime was committed with force, and guilty of disseminating matter harmful to juveniles. The jury found appellant not guilty of the remaining charges. Subsequently, the jury also determined appellant was not guilty of the sexually violent predator specification.
The trial court thereafter ordered a presentence investigation and report prior to conducting a sentencing hearing at which it considered also the state's motion to declare appellant a sexual predator pursuant to R.C. 2950.09(B)(1). The trial court took into account the relevant factors before determining appellant was a sexual predator.[5]
When the trial court proceeded to the sentencing phase of the hearing, defense counsel acknowledged "that pursuant to statute there is a mandatory life sentence on the conviction of rape." Counsel requested, however, that any term imposed on the remaining count be ordered concurrent with that sentence.
The trial court subsequently imposed terms of imprisonment upon appellant of life on count one to be served consecutively with eighteen months on count two.
Appellant has filed a timely appeal of his convictions. He presents four assignments of error for review.
Appellant's first and second assignments of error are related; therefore, they are addressed together as follows:
 I. THE COURT ERRED WHEN IT EXCLUDED, ON THE BASIS OF THE RAPE SHIELD LAW (R.C. OF OHIO § 2907.02[D]), CERTAIN EVIDENCE WHICH EXCLUSION PREVENTED THE JURY FROM HEARING EVIDENCE WHICH BORE DIRECTLY ON THE CREDIIBILITY OF THE ALLEGED RAPE VICTIM.
 II. THE COURT ERRED AND THE ACCUSED'S RIGHT TO PRESENT A FULL DEFENSE AND HIS RIGHT OF CONFRONTATION WERE DENIED WHEN THE COURT EXCLUDED EVIDENCE THAT MIGHT HAVE HAD A SIGNIFICANT IMPACT ON THE RESULT OF THE TRIAL.
Appellant argues his right both to confrontation and to present a defense were compromised at trial when the court refused to permit him to either of the following: inquire of the victim about her relationship to her stepfather or give certain testimony
During defense counsel's cross-examination of the victim, the trial court sustained the prosecutor's objection to counsel's question whether the victim remembered telling some of her class-mates that her stepfather want[ed her. Later, during his direct examination, as appellant began to explain why he had the victim alone in his vehicle on the day Versie came with her to class, the trial court again sustained the prosecutor's objection to appellant's statement that the victim sought him out in order to confide in him about her stepfather "bothering her."
The trial court excluded this line of inquiry and testimony based upon R.C. 2907.02(D), which provides in pertinent part:
 (D) Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.
(Emphasis added.)
Regarding this section of the statute, the supreme court has observed:
 The rape shield law in Ohio, R.C. 2907.02(D), essentially prohibits the introduction of any extrinsic evidence pertaining to the victim's sexual activity. The exceptions to this prohibition are evidence of the origin of semen, pregnancy, or disease, or of the victim's past sexual activity with the offender. In State v. Gardner (1979), 59 Ohio St.2d 14
[13 O.O.3d 8], this court set forth the major reasons behind the enactment of the rape shield law:
 "* * * First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.
 The evidence at issue in this case is undeniably inadmissible under the rape shield law. Appellee claims, however, that the application of the rape shield law in this case violates his Sixth Amendment right to confront witnesses against him.
* * *
 * * * [T]he Gardner court acknowledged that in some circumstances evidence which the rape shield law would render inadmissible would nevertheless be admitted in furtherance of the defendant's constitutional rights. In Gardner,
the excluded evidence was designed merely to impeach the victim's credibility, and thus had no probative value as to the alleged rape itself.
* * *
 In State v. Ferguson (1983), 5 Ohio St.3d 160, this court again dealt with the rape shield law in the context of testimonial evidence relating to specific instances of the victim's sexual history. In Ferguson, the alleged victim testified that she had not had sexual intercourse within ten days prior to her confrontation with the defendant. The court held that the defendant's evidence in rebuttal was inadmissible, stating in paragraph two of the syllabus:
 "R.C. 2907.02(D) will render inadmissible evidence of the rape victim's sexual activity with one other than the accused where the evidence: does not involve the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender; is offered simply to impeach the credibility of the victim; and is not material to a fact at issue in the case."
 The evidence excluded in Ferguson was determined by the court to meet all three prongs of the above test.
 The key factor in both Gardner and Ferguson is that the contested evidence was submitted merely to impeach the victim's credibility. The testimonial evidence was considered not probative of the determinative issue of fact: whether the victim was raped by the defendant on the date alleged.
State v. Williams (1986), 21 Ohio St.3d 31 at 34-36. (Emphasis added; footnotes omitted.)
It must first be observed that appellant made no effort to comply with the requirements of R.C. 2907.02(E) and (F), which permit the trial court to determine the admissibility of evidence of any sexual activity of the victim after a hearing on the matter in chambers.
Instead, appellant made statements alleging the victim had sexual activity both in his opening statement and on direct examination. This evidence was injected into the trial before the trial court could sustain the prosecutor's objection to it. Additionally, the trial court failed to give a curative instruction at that point in the trial. Thus, the jury heard the evidence appellant asserts improperly was excluded.
Despite appellant's arguments on appeal, moreover, a review of the record in this case reveals appellant initiated the introduction of this evidence only to impeach the victim's credibility on the determinative issue of fact: whether appellant raped her on the second occasion he asked her to his home to "baby-sit." State v.Gardner (1979), 59 Ohio St.2d 14.
Therefore, the trial court properly applied R.C. 2907.02(D) to bar the introduction of any further evidence of this type by appellant. Id.; State v. Ferguson (1983), 5 Ohio St.3d 60; Statev. Cox (Jan. 30, 1992), Cuyahoga App. No. 59709, unreported; cf.,State v. Williams, supra.
Accordingly, appellant's first two assignments of error are overruled.
Appellant's third assignment of error states:
 THE VERDICTS FINDING THE APPELLANT GUILTY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW.
Appellant argues the evidence cannot support his convictions, contending the victim's testimony was vague, equivocal and contradictory. A review of the record belies appellant's argument.
With regard to an appellate court's function in reviewing the weight of the evidence, the supreme court has set forth the following as the relevant analysis:
 * * * Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may never-the-less conclude that the judgment is against the weight of the evidence. (Citation omitted.) * * *
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a thirteenth juror and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs [v. Florida (1982)], 457 U.S. [31], at 42, 102 S.Ct. [2211] at 2218, 72 L.E.2d [652] at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 (The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.).
State v. Thompkins (1997), 78 Ohio St.3d 380 at 387. (Emphasis added.)
Thus, this court must be mindful that the weight of the evidence and the credibility of the witnesses are matters primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
The victim's testimony in this case was clear and compelling. She gave a convincing chronology of her association with appellant but could not correspond the events that occurred to precise dates. In view of her young age, this is not unusual. Moreover, the victim's parents were confused about the chronology of appellant's crimes only because the victim felt safer disclosing to them the videotape episode first.
The victim's testimony was corroborated by that of the other state's witnesses, including Versie Gant and the nurse-practitioner. The jury was well within its prerogative to believe these witnesses rather than appellant and his witnesses, whose testimony in large part was unbelievable. Thus, the verdicts of guilty were not against the manifest weight of the evidence. Statev. Gingell (1982), 7 Ohio App.3d 364; State v. Cox, supra; State v.Gearing (Apr. 8, 1993), Cuyahoga App. No. 62202, unreported; Statev. Corrothers (Feb. 12, 1998), Cuyahoga App. No. 72064, unreported;State v. Bugg (Sept. 30, 1999), Cuyahoga App. No. 74847, unreported;State v. Bluford (Dec. 9, 1999), Cuyahoga App. No. 75228, unreported;State v. Ferris (Nov. 17, 1998), Franklin App. No. 98AP-24, unreported.
Accordingly, appellant's third assignment of error also is overruled.
Appellant's fourth assignment of error states:
 THE COURT ERRED, OR ABUSED ITS DISCRETION, WHEN IT SENTENCED THE DEFENDANT TO THE MAXIMUM TIME ALLOWED FOR THE RAPE, WHICH WAS SAID TO HAVE BEEN COMMITTED WHEN THE APPELLANT INSERTED HIS FINGER IN THE PROESCUTRIX'S (SIC) VAGINA.
Pursuant to R.C. 2907.02(B), appellant's forcible rape of a child under the age of thirteen mandated a life sentence. Since the trial court had no discretion in this regard, it hardly could have abused it. R.C. 2929.13(F)(2).
Appellant's fourth assignment, therefore, also is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _______________________________________________________ MICHAEL J. CORRIGAN, J. and JAMES M. PORTER, J. CONCUR
 PRESIDING JUDGE, KENNETH A. ROCCO
[1] Quotes indicate testimony given by a witness at appellant's trial.
[2] This case was labeled Common Pleas Case No. CR-367,508.
[3] Common Pleas Case No. CR-371,757.
[4] The named victim in these counts was the photographed child.
[5] Although appellant states in the argument portion of his appellate brief with respect to his fourth assignment of error that this ruling is "challenged," he presents nothing more than this bald statement. Since appellant provides neither statements explaining the basis of his challenge nor citations to authority which support his challenge, this court will not consider it. App.R. 16(A)(7); App.R. 12(A)(2). of his own on direct examination. Appellant's argument is meritless.